UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 20-21601-CIV-WILLIAMS

UNITED STATES OF AMERICA,

                *Plaintiff,*

vs.

GENESIS II CHURCH OF HEALTH
   AND HEALING;
MARK GRENON;
JOSEPH GRENON;
JORDAN GRENON; and
JONATHAN GRENON,

                *Defendants.*

## GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT

During the May 11, 2020 hearing on the government's Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt (D.E. 23), this Court authorized additional briefing and submission of authorities on two issues: (1) whether Defendants' statements regarding MMS products on their internet websites amount to "labeling" in violation of this Court's Orders; and (2) what the United States views as an appropriate remedy should the Court conclude that Defendants are in contempt of its Orders. In response, the government provides case law addressing the substantive law on labeling and demonstrates that Defendants are in clear violation of the Court's Orders because they continue to engage in labeling MMS through their websites and—as recently as just a few days ago—continue to distribute their fraudulent MMS products in interstate commerce. Accordingly, because Defendants are in violation of the Court's Orders, the

government recommends the Court hold Defendants in contempt and order the assessment of a daily fine against Defendants with a possible escalation to incarceration.[1]

### A. UNDER THE FEDERAL FOOD, DRUG, AND COSMETIC ACT, "LABELING" IS BROADLY DEFINED

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), "labeling" includes "**all** labels and **other** written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m) (emphasis added). Defendants' websites clearly fall within the second clause.

In *Kordel v. United States*, 335 U.S. 345 (1948), the Supreme Court explained what it means to "accompany" an article within the meaning of 21 U.S.C. § 321(m). As the Court held, "physical attachment or contiguity is unnecessary" for literature to "accompany" an article and be considered "labeling" under the [FDCA]." *Id.* at 351. Rather, "[o]ne article or thing is accompanied by another when it supplements or explains it .... It is the textual relationship that is significant." *Id*. at 350 (emphasis added). For that reason, the Court in *Kordel* upheld the Defendant's conviction where the false and misleading "statements in circulars or pamphlets" "[were] designed for use in the distribution and sale of the drug, and [they were] so used." *Id.* at 346, 351." *Id.* The Court further noted that "[t]he advertising which we have here performs the same function as it would if it were on the article or on the containers or wrappers." *Id*. at 351. The Court characterized the interdependent booklets and drugs as "parts of an integrated distribution program." *Id*. at 350.

---

[1] The United States initially filed its Motion for an Order to Show Cause while the temporary restraining order was in effect, but before the Court had issued the preliminary injunction. As a result, the government's motion only addresses conduct that violated the TRO. Although the TRO has since been superseded by the preliminary injunction, the provisions enjoining Defendants in both orders are identical; Defendant's conduct spans across both orders' existence and equally violates both. Accordingly, to the extent the Court deems it necessary, the United States respectfully amends and renews its Motion for an Order to Show Cause to allege that Defendants' continuing conduct is in disobedience of both the temporary restraining order and the preliminary injunction.

The same day that it decided *Kordel*, the Supreme Court also decided *United States v. Urbuteit*, 335 U.S. 355 (1948). The question in *Urbuteit* was whether leaflets that were distributed after the shipment of the defendant's medical devices constituted labeling under the FDCA. Applying its holding in *Kordel*, the Court found the temporal gap between shipment of the devices and the literature to be immaterial because "the advertising matter that was sent was designed to serve and did in fact serve the purposes of labeling." 335 U.S. at 357. Measuring the two transactions (i.e., the shipment of the leaflets and the shipment of the devices) by "functional standards," the Court found that they were "integrated." *Id*. In other words, because the leaflets at issue "explained the usefulness of the device in the diagnosis, treatment, and cure of various diseases," the Court reasoned, they constituted labeling under the FDCA. *Id.*; *see also United States v. Urbuteit*, 336 U.S. 804, 805 (1949) (on appeal from remand, clarifying that "the fact of separate shipments of machines and leaflets was immaterial. The controlling factors were whether the leaflets were designed for use with the machine and whether they were so used.").

The FDCA's "labeling" definition is thus quite broad, and courts have limited its reach only in extreme cases. For example, while literature displayed in a store was labeling when there was evidence that the literature was used to promote the sale of honey, *United States v. 250 Jars, etc., of U.S. Fancy Pure Honey*, 218 F. Supp. 208 (E.D. Mich. 1963), *aff'd*, 344 F.2d 288 (6th Cir. 1965), books in a store that mentioned certain products by name were not labeling when there was "no basis for finding that [the store in which both were displayed] did more than carry two related products." *United States v. 24 Bottles ... "Sterling Vinegar & Honey, Etc.,"* 338 F.2d 157, 159 (2d Cir. 1964). *See also United States v. Hanafy*, 302 F.3d 485, 486 (5th Cir. 2002) ("merely identifying the contents of a shipping tray with no more information than that which is already upon the articles themselves" did not rise to level of labeling).

Under *Kordel, Urbuteit,* and their progeny, "the term 'labeling' must be given a broad meaning to include all literature used in the sale of food and drugs, whether or not it is shipped into interstate commerce along with the article." *V.E. Irons, Inc. v. United States*, 244 F.2d 34, 39 (1st Cir. 1957), *cert. denied*, 354 U.S. 923 (1957). See also *United States v. 7 Jugs, Etc.*, 53 F. Supp. 746, 753 (D. Minn. 1944) (stating that "the word 'accompany' should be given an interpretation which accords with the Congressional purpose," and citing legislative history showing that "labeling" was meant to include "**all** circulars and **material** ... that may **in any form whatever** accompany the article") (emphasis added).

### B. DEFENDANTS' WEBSITES MAKE CLAIMS REGARDING MMS' INTENDED USES AND ARE LABELING UNDER THE FDCA

In its opening motion for preliminary relief and accompanying declarations (D.E. 3), the United States more thoroughly described the content of Defendants' interrelated websites. *See,* Pl. Mot. for TRO, at 6–8 (D.E. 3) & accompanying declarations of Tiffany Petty and Jason Humbert (D.E. 3-1 & 3-2). Those websites—still in operation today—continue to provide false and misleading information to the public about Defendants' unapproved new drug, MMS. Specifically, the overt purpose of these websites is to "explain[] the usefulness of the [drug] in the diagnosis, treatment, and cure" of diseases. *Urbuteit*, 335 U.S. at 357. As explained in the government's Motion to Show Cause, these same websites also continue to direct consumers on how to obtain MMS from other components of Defendant Genesis II Church of Health and Healing ("Genesis"). *See* Pl. Mot. for Or. to Show Cause, at 3–4 (D.E. 23) and Supp. Decl. of Jason Humbert ("Humbert Decl. II") (D.E. 23-1) (describing how Genesis's sales website directs consumers to contact Genesis by email, describing email exchange with Defendant Jordan Grenon, and Genesis website that continues to provide instructions to contact other Genesis "Church Providers" of MMS).

The interrelated Genesis websites bear the "distinguishing characteristic" that, "in some manner or another, [they are] presented to the customer in immediate connection with his view and

4

his purchase of the product." *24 Bottles*, 338 F.2d at 159. It is manifestly evident, especially when taken together, that all of the Genesis websites are part of an integrated distribution program for Genesis's MMS product, both **directly**—through the named defendants—and **indirectly** through the various arms, branches, chapters, and members of the organization. Because Defendants' websites constitute written, printed, and graphic material that "supplements or explains" MMS, including how to use it to treat different diseases, the websites are labeling.

To conclude that Defendants' websites constitute labeling under the FDCA would hardly be novel or extraordinary. There are myriad examples of federal courts concluding that websites like Defendants' constitute labeling. *See, e.g.*, *United States v. Innovative Biodefense, Inc.*, No. SACV180996DOCJDEX, 2019 WL 2428670, at *4 (C.D. Cal. Feb. 22, 2019) (focusing on whether the content of the website relates specifically to the drug to determine whether that website constituted part of drug's labeling and noting that "majority of district courts that have considered the issue have determined that statements on a drug product's website generally constitute part of the product's labeling."); *United States v. S Hackett Marketing LLC*, No. 17-04911, 2018 WL 4146606, at *3 (D.N.J. Aug. 30, 2018) (granting default judgment and permanent injunction against defendants who distributed unapproved new drugs through "hundreds of websites" and finding that drug's labeling "includes … Defendants' websites from which the products may be ordered."); *United States v. BioAnue Labs., Inc.*, No. 5:13-CV-188, 2014 WL 3696662, at *6 (M.D. Ga. July 23, 2014) (issuing permanent injunction after finding that "the various websites from which the products are peddled," including separate websites run by associated persons containing testimonials of product's users, were "clearly relevant as labeling"); *United States v. Berst*, No. 11-cv-6370, 2012 WL 4361408, at *4 (D. Or. Aug. 12, 2012) (issuing permanent injunction against defendants who sold unapproved new drugs to treat, *inter alia*, cancer and hypertension via website and finding that website "qualifies as labeling within the meaning of the FDCA").

Indeed, in a remarkably similar case, Chief Judge Moore of this Court recognized that websites promoting the unapproved new drug were labeling. *See United States v. Flu Fighter Corp.*, No. 05-61940-CIV, 2009 WL 10668958, at *4 n.2 (S.D. Fla. Feb. 11, 2009) ("Defendant's website, www.cancercure.org, qualified as labeling for [the unapproved new drug]."). In *Flu Fighter,* the defendants were distributing a product called "Cancer Control" that they claimed could effectively treat "breast, lung, prostate, colon, skin, liver, blood (leukemia), kidney, pancreas, brain and most other forms of … cancer within six weeks." *Id.* at *1. As in the present case, this Court also found that that the drug's labeling—the websites—was false and misleading because they contained "numerous false claims." *Id.* at *5. Notably, the *Flu Fighter* defendants were held in civil contempt for failing to disable the websites promoting their product, as this Court's temporary restraining order required. *Id.* at *1; *see also* slip op., *United States v. Flu Fighter Corp.,* No. 05-cv-61940, at 9 (S.D. Fla. July 26, 2006) ("*Flu Fighter I*") (holding defendants in civil contempt).

## C. Defendants Continue to Distribute MMS in Violation of this Court's Orders

Since its initial motion on this issue, the United States has developed additional evidence establishing that Defendants continue to indirectly distribute MMS in violation of this Court's orders. On May 12, 2020, nearly a month after this Court first enjoined Defendants and the day after the show cause hearing, an FDA investigator using a fictitious identity received a coupon for ten percent off to be used "for your next order" through a subscription he made to Genesis's newsletter on the organization's website, www.genesis2church.ch. Second Supp. Decl. of Jason Humbert ("Humbert Decl. III), at ¶ 5 (attached as Ex. 1). That same day, using the fictitious identity, the FDA investigator sent an email to Defendant Jordan Grenon about use of the "10% off" coupon. *Id.*

Defendant Jordan Grenon responded by email later the same day. *Id.* at ¶ 6. The May 12 email response was identical to the email a different FDA fictitious identity received during an

6

earlier undercover interaction seeking to purchase MMS from Genesis on April 25, 2020. *Id. See also* Humbert Decl. II, at ¶ 7 (D.E. 23-1). As in the prior contact, Defendant Jordan Grenon stated in his email to the putative consumer that Genesis's direct-to-consumer sales "website is on hold," but "for an alternate source contact in the USA 1-865-654-7147." Humbert Decl. III, ¶ 6. During the April interaction, that telephone number was identified as belonging to an individual known as "Bob the Plumber" on various Genesis media programs. *Id.* at ¶ 7; *see also* Humbert Decl. II, at ¶ 8. In addition to offering "Bob the Plumber" as a conduit to obtain Genesis's MMS., Jordan Grenon's provided other go-betweens, telling his customer, "for more providers go to https://genesis2church.ch/contact-map," which lists the contact information for numerous arms of the Genesis organization from whom customers can obtain MMS products. Humbert Decl. III, ¶ 6.

The FDA investigator followed Defendant Jordan Grenon's instructions on the next day, May 13, and using a different fictitious identity, called the number that Jordan had provided. *Id.* at ¶ 8. An individual who identified himself only as "Bob" answered the investigator's call. *Id.* After the FDA investigator explained that he was a consumer who was seeking MMS as a medical treatment for himself and his father-in-law, and that Genesis had directed him to make the call, Bob agreed to send the drug to the FDA investigator. *Id.* Bob noted during the call that this distribution was in addition to the approximately four or five that he expected to ship to consumers on the same day. *Id.* ¶ 9. The following day, May 14, Bob called the investigator to confirm shipment and to advise that he should expect to receive the package within a few days. *Id.*

The package, sent from Tennessee, arrived at an FDA undercover mailbox in Virginia on May 17. *Id.* Inside the package were four plastic bottles labeled "MMS" and "Activator." *See* Hubert Decl., Ex. 7, reproduced as Figure 1, *infra*. The labels on the bottles of drug also prominently displayed the logo of Defendant Genesis II Church and bore the name of Defendant "Archbishop Mark Grenon." The package also contained literature about MMS that referenced

7

multiple Genesis websites, including a website that re-directs to a testimonial-page containing claims that MMS cures, mitigates, treats, and/or prevents multiple serious diseases, including COVID-19. *Id*. These events demonstrate clearly that Defendants are, at a minimum, using agents and go-betweens to indirectly distribute MMS in violation of this Court's orders.



*Figure 1 - Contents of Package Received from "Bob" on May 17, 2020*

Defendants' own public admissions further confirm that they continue to indirectly distribute MMS, disobeying this Court's clear mandate. Through various social media posts and public pronouncements made during the course of this action, Defendants have openly described how they continue to act in concert and participation with various components and constituents of their organization in a concerted effort to circumvent the Court's prohibition on distribution.

Less than a week after the United States filed its Motion for an Order to Show Cause, Defendant Jonathan Grenon published two videos on YouTube (one in English and the other in Spanish) in which he continues to tout Genesis' MMS as an effective treatment for, *inter alia*, dental infection for consumers who may be unable to see a dentist due to COVID-19 restrictions. Tr. of Jonathan Grenon, *G2 Sacramental Daily Bottle* (May 3, 2020), 4–7, attached as Exhibit 2. Shot against a backdrop of the Genesis II Church logo, not only does the Jonathan Grenon's video continue to demonstrate MMS's intended use as a drug, but also discloses that, despite this Court's Order, Defendants' unlawful drug product continues to be available for distribution through various components and branches of the Genesis organization:

> [S]eeing how we've been attacked, harassed, and basically wrongfully accused … If you're still seeking our sacraments, there are many members and bishops that are providing it freely, okay? Some people accept donations, and some can freely. Some donate so others can receive freely. So, it's basically a great system to help others, which we're commanded to do."

*Id.* at 2–3.

Defendant Mark Grenon has been even more unabashed in describing Defendants' use of alternate Genesis channels to continue to distribute MMS—openly mocking the Court's efforts to stop Defendants' continued unlawful distribution of the drug. In yesterday's weekly *G2Voice* podcast, Defendants Mark and Joseph Grenon proclaimed:

> MARK GRENON: And that's why we—we've prayed since the beginning, "Lord, just give us a grass-roots growth, a few people that will grow around the world." And now, they are shutting us down, supposedly? They're not shutting down our church. This is the voice of the church! Do you sound like—Does it sound like we're being shut down? We, voluntarily, under duress, 'cause they got guns in our face, threatening us to throw us in jail, we said, "No, you know what? We're going to just stop and pray." … We haven't—we haven't sent out one sacrament since April 17. But, guess what? Many have been sent out all throughout America and the world to people that need it.
>
> JOSEPH GRENON: Mmmm-hmm.
>
> MARK GRENON: From people we've trained. Ha! I love it! This is so good.

*G2Voice Broadcast #191—The Contempt of the Department of Justice Against the 1st Amendment and God Continues! What Will "The People" Do?,* 11:11 (May 17, 2020) (downloaded using iTunes). Later in the podcast, Defendant Mark Grenon repeats this refrain: "We're still making sure everybody get [sic] them [bottles of MMS], but it's not us. It's other people doing it. I love it!" *Id.* at 24:57. But this Court's Orders prohibit Defendants and "Associated Persons" from not only "directly" distributing MMS (*e.g.,* direct-to-consumer), but also from doing so indirectly (*e.g.,* through the use of agents or other intervening persons or conditions). *See* TRO, at 3 (D.E. 4);

9

Prelim. Inj., at 8 (D.E. 26). These statements are patent admissions that Defendants are orchestrating the continued distribution of MMS in derogation of this Court's clear and unambiguous orders. Mark Grenon's own words make explicit that he and his co-defendants are "still making sure" that MMS continues to be intentionally distributed through "other people," *i.e.,* non-defendant components and agents of the Genesis organization, notwithstanding this Court's orders to the contrary. And, strikingly, Defendant Mark Grenon apparently "love[s] it."

Taken together, this evidence makes clear that all five Defendants are in contempt of this Court. In the month that has passed since first being enjoined, each Defendant intentionally has participated in conduct this Court has categorically prohibited:

- **Jordan Grenon** has provided directions to consumers how to obtain MMS from arms and agents of the Genesis organization, which when followed, actually resulted in such distribution;

- **Jonathan Grenon** has posted and published at least one video describing how consumers to other Genesis components to have MMS distributed to them, as well as others that visually demonstrate how to use MMS for the treatment of disease.

- **Mark Grenon and Joseph Grenon** have together admitted that they are continuing to indirectly cause the distribution of MMS.

- **Genesis**, through the direction of the other Defendants, continues to be responsible for labeling MMS through its various websites and continues to distribute MMS through various chapters, branches, arms, members, and other agents of the organization.

There is clear and convincing evidence that each of the named Defendants in this action have failed and refused to obey the clear and unambiguous Orders of this Court. Each should be held in civil contempt until compliance with this Court's Orders is achieved.

### D. DEFENDANTS SHOULD FACE PROGRESSIVELY ESCALATING SANCTIONS— INCLUDING INCARCERATION—UNTIL COMPLIANCE IS ACHIEVED

1. *The Legal Standard for Civil Contempt Has Been Met*

Courts have the inherent power to compel compliance with their orders through civil contempt proceedings. *Citronelle–Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th

Cir. 1991) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966). The legal standard by which to persuade a court to hold a defendant in contempt is that the plaintiff must prove by "clear and convincing" evidence that the defendant violated the order in question. This requires proving that (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order. *S.E.C. v. Greenberg*, 105 F. Supp. 3d. 1342, 1345 (S.D. Fla. 2015) (citing *C.F.T.C. v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992)). To meet the initial burden for a finding of civil contempt, a moving party need only show that defendant failed to comply with the court's order. *Van De Velde NV v. Felder*, No. 15-24096-CIV, 2017 WL 8895345, at *3 (S.D. Fla. May 25, 2017) (citing *United States v. Rylander*, 460 U.S. 752, 755 (1983)). Evidence is clear and convincing when the evidence presented "could place in the … fact finder an abiding conviction that the truth of [the] factual contentions are highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

Once the plaintiff satisfies its initial burden of showing the order was violated, the burden then shifts to the defendant to come forward with evidence showing in detail why contempt should not be found. *Watkins*, 943 F.2d at 1301. To avoid a finding of contempt, a defendant must show that he either did not violate the court order as alleged or that he was excused from complying with such order. *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990).

> 2. *Various Sanctions Are Available to the Court to Coerce Compliance, Including Coercive Incarceration*

When imposing sanctions for civil contempt, a court "ha[s] numerous options, among them: a coercive daily fine, a compensatory fine, attorneys' fees and expenses … and coercive incarceration." *Watkins*, 943 F.2d at 1304. Coercive incarceration is within the inherent power of the Court, insofar as it depends on the contemnor's ability to comply, thereby purging himself of contempt. Coercive incarceration is designed to coerce, rather than punish, and therefore the ordinary requirements of due process do not attach. *Shillitani*, 384 U.S. at 369–70; *see also S.E.C.*

*v. Solow*, 396 Fed. App'x 635 (11th Cir. 2010) (affirming district court's adjudication of civil contempt and ordering defendant's incarceration until he purged his contempt in compliance with court's directive). With civil contempt, "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 844, (1994) (internal quotation omitted). Accordingly, sanctions imposed for civil contempt to coerce compliance "cannot be any greater than necessary to ensure such compliance" and may not be so excessive as to be punitive in nature. *Watkins*, 943 F.2d at 1304; *In re Trinity Indus.*, 876 F.2d 1485, 1493 (11th Cir. 1989).

In a case formerly before this Court, *Garza v. Luis Garcia Land Serv. Co.*, 218 F. Supp. 3d 1375, 1380-81 (S.D. Fla. 2016), U.S. Magistrate Judge Simonton found the contemnor, Luis Martinez, in civil contempt for his repeated failing to appear for a deposition and in court for a show cause hearing. Judge Simonton concluded that under the circumstances, the only sanction that would likely ensure Martinez's presence at his deposition was to issue a warrant for his arrest if he failed to appear for his deposition at a future date. *Id.* at 1381. In other words, Judge Simonton concluded that Martinez would be given the ability to purge himself of civil contempt by appearing for his deposition at a future date certain. If Martinez did not appear and sit for the deposition, then a warrant would be issued promptly for his arrest, and he would be incarcerated until he sat for the deposition. *Id.*

3. *Given the Facts of this Case, the United States Recommends a Three-Phase Progressive Approach to Sanctions*

If the Court holds Defendants in contempt of its Orders, then the government respectfully recommends an approach that permits Defendants to purge themselves of their contempt, while at the same time recognizing that Defendants already have demonstrated a history of repeatedly refusing to obey even the most ministerial orders of this Court. *See, e.g.,* Order Requiring Defs. to Comply with Rules of Court (D.E. 14) (Apr. 23, 2020). Consequently, the United States

recommends that sanctions against Defendants begin with daily fines, but swiftly progress to coercive incarceration should pecuniary sanctions prove ineffective to coerce compliance. In this way, it is Defendants who are able to exercise control and determine for themselves the level of sanctions that will induce compliance.

    a. <u>Phase I: Ten Days of $1,000 per Day Fines Against All Defendants</u>

Accordingly, the United States first recommends that a fine be assessed against all of the Defendants, jointly and severally, in the amount of $1,000.00 per day that they remain in violation of the Court's Order. Should Defendants present sufficient evidence to the Court of their full and complete compliance with all provisions of the preliminary injunction before ten days have elapsed, the imposition of any accumulated fine should be permanently stayed.

    b. <u>Phase II: Issuance of Arrest Warrants and Stay of Execution for Seven Days</u>

If, after ten calendar days, Defendants fail to demonstrate to the Court full and complete compliance with all provisions of the preliminary injunction, then the United States recommends that the Court issue warrants for the arrest of each of the individual Defendants: Mark Grenon, Joseph Grenon, Jordan Grenon, and Jonathan Grenon. Moreover, the accumulated fine should remain in place as to all Defendants, including the Genesis entity.

In order to provide Defendants with a seven-day grace period in which they would have the opportunity to purge their contempt without being brought before the Court, the United States will immediately provide notice to the individual Defendants of the warrants after their issuance, by email or other reasonable means. The United States recommends that the Court order a stay of execution of the arrest warrants for a period of seven days, during which time the United States shall hold but not execute the arrest warrants. During this stay, Defendants may purge their contempt by providing sufficient evidence to the Court that they are in full compliance with all provisions of the preliminary injunction and by paying any fine imposed. Should Defendants

successfully purge their contempt, the United States recommends that the Court vacate the arrest warrants.

      c. <u>Phase III: Arrest Warrant Execution and Coercive Incarceration</u>

Should the individual Defendants fail to purge their contempt at the end of the seven-day stay, the United States recommends that the stay automatically expire and that it shall then be permitted to execute the warrants and allow the United States Marshals Service (or any other duly authorized law enforcement officer) to arrest the individual defendants. Upon such arrest, the individual Defendants will be incarcerated until such time as they have fully complied with every provision of the preliminary injunction and paid any fine imposed.

## CONCLUSION

The United States respectfully submits that there is clear and convincing evidence that that Defendants have violated the valid, lawful, clear, and unambiguous orders of this Court despite their ability to comply. As a result, the United States respectfully requests that, absent a showing by Defendants that compliance is impossible, the Court enter an Order holding Defendants in contempt of this Court and ordering such sanctions as described above.

Dated this 18th day of May, 2020.

Respectfully submitted,

JOSEPH H. HUNT  
Assistant Attorney General  
U.S. Department of Justice

GUSTAV W. EYLER  
Director  
Consumer Protection Branch

ARIANA FAJARDO ORSHAN  
United States Attorney

*Ross S. Goldstein*
ROSS S. GOLDSTEIN
Court ID No. A5502651
Senior Litigation Counsel

Ross.Goldstein@usdoj.gov
202-353-4218 (office)
202-514-8742 (fax)

*David A. Frank*
DAVID A. FRANK
Court ID No. A5500486
Senior Litigation Counsel

U.S. Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, D.C. 20044

David.Frank@usdoj.gov
(202) 307-0061 (office)
(202) 514-8742 (fax)

*Matthew J. Feeley*
MATTHEW J. FEELEY
Florida Bar No. 12908
Assistant United States Attorney

99 N.E. 4th Street, Suite 300
Miami, FL 33132

Matthew.Feeley@usdoj.gov
305-961-9235 (office)
305-530-7139 (fax)

*Counsel for the United States of America*

OF COUNSEL:

ROBERT P. CHARROW
General Counsel

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
U.S. Department of Health and Human Services

ANNAMARIE KEMPIC
Deputy Chief Counsel, Litigation

JOSHUA A. DAVENPORT
Associate Chief Counsel for Enforcement
U.S. Department of Health and Human Services
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

## CERTIFICATE OF SERVICE

       I hereby certify that on May 18, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF, electronic mail or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:      *s/ Ross S. Goldstein*
           Ross S. Goldstein
           Senior Litigation Counsel
           U.S. Department of Justice

## SERVICE LIST

United States of America
*vs.*
GENESIS II CHURCH OF HEALTH AND HEALING;
MARK GRENON;
JOSEPH GRENON;
JORDAN GRENON; and
JONATHAN GRENON

CASE NO. 20-21601-CIV-WILLIAMS
United States District Court Southern District of Florida

| | |
|---|---|
| **ROSS S. GOLDSTEIN**<br>Court ID No. A5502651<br>Senior Litigation Counsel<br>Ross.Goldstein@usdoj.gov<br>202-353-4218 (office)<br>202-514-8742 (fax)<br><br>**DAVID A. FRANK**<br>Court ID No. A5500486<br>Senior Litigation Counsel<br>U.S. Department of Justice<br>Consumer Protection Branch<br>P.O. Box 386<br>Washington, D.C. 20044<br>David.Frank@usdoj.gov<br>(202) 307-0061 (office)<br>(202) 514-8742 (fax) | **GENESIS II CHURCH OF HEALTH AND HEALING**<br>contact@genesis2church.is<br>2014 Garden Ln.<br>Bradenton, FL 34205<br><br>**MARK GRENON**<br>mark@genesis2church.is<br><br>**JOSEPH GRENON**<br>joseph@genesis2church.is<br><br>**JORDAN GRENON**<br>jordan@genesis2church.is<br>6210 35th Avenue West<br>Bradenton, FL 34209 |

| | |
|---|---|
| **MATTHEW J. FEELEY**<br>Florida Bar No. 12908<br>Assistant United States Attorney<br>99 N.E. 4th Street, Suite 300<br>Miami, FL 33132<br>Matthew.Feeley@usdoj.gov<br>305-961-9235 (office)<br>305-530-7139 (fax)<br><br>*Counsel for the United States of America* | **JONATHAN GRENON**<br>jonathan@genesis2church.is<br>2014 Garden Ln.<br>Bradenton, FL 34205<br><br>*Defendants* |