UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 20-21601-CIV-WILLIAMS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

GENESIS II CHURCH OF HEALTH AND HEALING, *et al.*,

    Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court on Plaintiff's, United States of America ("Government"), motion for final default judgment against Mark Grenon and Joseph Grenon (collectively, "Defendants"). (DE 72.) Defendants have not responded to the motion and the time to do has now passed. For the reasons below, the motion (DE 72) is **GRANTED**.

    I.    **BACKGROUND**

This action arises out of Defendants' marketing and distribution of a product called Miracle Mineral Solutions ("MMS"), a drug Defendants claim is a cure for COVID-19 and other serious diseases. MMS consists of 22.4% sodium chlorite ($NaClO_2$), 5% sodium chloride (NaCl), 1% "trace minerals," and 71.6% purified water. (DE 3 at 5.) It is sold with an "activator" that contains 4% hydrochloric acid (HCl). (*Id.*) When the MMS and the activator are combined, as directed by the product labeling, a chemical reaction occurs yielding chlorine dioxide ($ClO_2$), a chemical commonly used as an industrial bleach. (*Id.*)

1

Mark Grenon is the founder of Genesis II Church of Health and Healing ("Genesis"), an entity based in Bradenton, Florida that describes itself as a "non-religious church," focused on "restoring health to the world." (DE 1 ("Complaint") at ¶¶ 4, 5.) While the organization is non-religious, its leaders hold clerical titles. Mark Grenon holds the title "Archbishop" and Joseph Grenon is known as a "Bishop." (*Id.* at ¶¶ 5-6.) Defendants, along with its other leaders, are involved in Genesis' operations, including the labeling, holding, and distribution of MMS. (*Id.* at ¶¶ 5-6.)

Defendants operated several websites on which they marketed and sold MMS, including www.newg2sacraments.org ("Sales Website"), g2churchnews.org ("News Website"), g2voice.is ("Radio Website"), genesis2church.ch, and others.[1] (*Id.* at ¶ 4.) On these websites, Defendants explained that MMS is a treatment and cure for COVID-19, Alzheimer's, autism, brain cancer, HIV/AIDS, multiple sclerosis, and other illnesses. (*Id.*) For instance, on March 3, 2020, Defendants posted the following claims on the News Website:

> **G2Church Sacramental Dosing for Coronavirus!**
>
> **For Adults**: 6 drops activated MMS in 4 ounces of water every two hours 5 times first day, Repeat 2nd day. If all symptoms are gone then continue with 3 drops and [sic] hour for 8 hours for another 3 days!
>
> **For Small Children**: same a [sic] above but with only 3 drops. 1 drop instead of 3 drops of the 3 days after the first two days of strong dosing!
>
> **NOTE:** This should wipe it out this flu-like virus that many are being scared with its presence in this world!
>
> **For Sacramental Guidance and products** please contact us at: support@genesis2church.is

---

[1] Defendants have since removed all content from these websites.

2

**The Coronavirus is curable!**

(Complaint at ¶ 14.) Defendants also distributed MMS in interstate commerce to customers who made purchases on the Sales Website. (DE 3 at 8.) On March 27, 2020, an undercover Food Drug Administration ("FDA") employee visited the Sales Website and ordered various MMS products. (DE 3-1 at ¶ 16.) On March 30, 2020, the FDA received Defendants' package containing the purchased products in Ashburg, Virginia, with a return address in Bradenton, Florida. (DE 3-2 at ¶ 11.)

On April 8, 2020, the FDA issued a warning letter to Defendants informing them that their marketing and distribution of MMS violated the FDCA. (DE 3-2 at ex. 8.) The letter requested Defendants to respond within 48 hours by describing the steps they have taken to correct the violations and warned them that their failure to comply may result in legal action. (*Id.*) A day later, Defendants posted the letter on the News Website, and in a response attributed to Mark Grenon, they stated that the FDA did not have jurisdiction over their activities or products, and that they would not be taking any corrective action. (*Id.* at ex. 9.) The post included a call to action to the organization's members, imploring them to send emails to the FDA, FTC, and the President. (*Id.*) Shortly after this response was posted, the FDA also received a written response signed by Mark Grenon, that stated the following:

> We are NOT under your authority in regard to your agencies
>
> We DO NOT need your approval for [MMS] or for anything we do in our Church.
>
> You have NO authority over us so why would we even consider your Act?
>
> We can say cure, heal, and treat as a Free Church. Don't need you [sic] approval or authorization . . . .

3

> There will be NO corrective actions on our part . . . You have no authority over us!
>
> We will NOT stop our Church Sacraments! . . . we will NOT comply!"
>
> We don't have to cease anything in regard to our Church Sacraments [MMS]! You cease and desist and harassing us!

(*Id*. at ex. 10.) Because Defendants did not comply with the warning letter, on April 16, 2020, the Government filed a Complaint against them seeking a permanent injunction under 21 U.S.C. § 332(a) to enjoin them from violating the following sections of the FDCA: 21 U.S.C. § 331(d) for introducing into interstate commerce unapproved new drugs; 21 U.S.C. § 331(a) for introducing into interstate commerce drugs that are misbranded within the meaning of 21 U.S.C. §§ 352(f)(1) and (a); and 21 U.S.C. § 331(k) for causing drugs to become misbranded while they are held for sale after shipment of one or more of their components in interstate commerce.[2] (Complaint at ¶¶ 9-13.)

On June 15, 2020, the summons and Complaint were properly served on Mark Grenon and Joseph Grenon pursuant to the Court's Order granting the United States' motion for alternative service. (DE 48; DE 50-1.) Pursuant to Rule 12(a)(4)(A) of the Federal Rules of Civil Procedure, the applicable time for Mark Grenon and Joseph Grenon to respond to the Complaint expired on July 6, 2020. Because Defendants did not respond to the Complaint, on May 29, 2020, the Government obtained a clerk's entry

---

[2] On July 9, 2020, the Court entered final default judgment and a permanent injunction order against the other defendants in this action, Genesis, Jordan Grenon, and Jonathan Grenon. (DE 54; DE 55.)

of default against them. (DE 61.) The Government now moves for the final entry of default judgment.[3] (DE 72.)

## II. **LEGAL STANDARD**

Under Rule 55 of the Federal Rules of Civil Procedure, if a defendant fails to plead or otherwise defend against a complaint, the Clerk of the Court may enter a default against that defendant. Fed. R. Civ. P. 55(a). Where a default occurs, the plaintiff's well-pled allegations are deemed admitted. *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987). Once a default is entered, a plaintiff may seek entry of a default judgment against the defaulting defendant. Fed. R. Civ. P. 55(b). A default judgment, however, is a matter of discretion for the court, not a matter of right to the moving party. *See Pitts ex rel. Pitts v. Seneca Sports, Inc.*, 321 F.Supp.2d 1353, 1356 (S.D. Ga. 2004). Before entering a default judgment, the court must ensure that the well-pled allegations in the complaint, taken as true by virtue of the default, actually state a substantive cause of action, and that there is a substantive, sufficient basis in the pleadings for the particular relief sought. *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007). While a defaulted defendant cannot challenge the sufficiency of the evidence, "[it] is entitled to contest the sufficiency of the complaint and its allegations to support the judgment." *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005).

---

[3] Mark Grenon and Joseph Grenon called in for the July 21, 2020 telephonic status conference. During the conference, the Court reminded Defendants that their response to the Government's motion for final default judgment was due on July 27, 2020. The Government also informed Defendants of this deadline via email on July 20, 2020. The Court further explained that Defendants were required to submit their response, and all other motions and memoranda, by complying with the Court's Order of Instruction to Pro Se Litigants (DE 14 and DE 71). The Government provided DE 71 to Defendants via email on July 20, 2020. The time for Defendants to file their response has now passed. To date, Defendants have not filed a response or a motion for extension to respond consistent with the Court's instructions. (*See* DE 71 at ¶ 1-2.)

"Entry of default judgment is only warranted when there is 'a sufficient basis in the pleadings for the judgment entered.'" *Surtain v. Hamlin Terrace Found*, 789 F.3d 1239, 1245 (11th Cir. 2015) (citation omitted). The Eleventh Circuit has explained that the standard for assessing entitlement to default judgment is "akin to that necessary to survive a motion to dismiss for failure to state a claim." *Id.* (citing *Chudasama v. Mazda Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997)).

III. **DISCUSSION**

In its motion, the Government seeks final default judgment against Defendants as to the three FDCA claims asserted in its Complaint: 21 U.S.C. § 331(d), distribution of unapproved new drugs into interstate commerce; 21 U.S.C. § 331(a), introduction of a misbranded drug into interstate commerce; and 21 U.S.C. § 331(k), causing the misbranding of drug while held for sale after shipment of its components in interstate commerce. The Government also urges the Court to enter a permanent injunction under 21 U.S.C. § 332 (a) to restrain Defendants from continued violations of these provisions. The Court first considers Plaintiff's entitlement to default judgment and then its request for a permanent injunction.

A. **The Government's Entitlement to Final Default Judgment**

1. **21 U.S.C. § 331(d)**

The FDCA defines a "drug" as a substance that is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man." 21 U.S.C. § 321(g)(1)(B). "The intended use of a product may be determined from any relevant source, including labeling." 21 C.F.R. § 201.128. "Labeling" is defined as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or

6

wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). The labeling need not be physically attached to the product and includes anything that explains the uses of the drug, such as marketing materials and websites. *See Kordel v. United States*, 335 U.S. 350 (1948); *United States v. Flu Fighter Corp*, 2009 WL 10668958, at *4 n.2 (S.D. Fla. Feb. 11, 2009) (finding the products' websites to constitute "labeling" under the FDCA); *United States v. Innovative Biodefense, Inc.*, 2019 WL 2428670, at *4 (C.D. Cal. Feb. 22, 2019) ("statements on a drug product's website generally constitute part of the product's labeling.").

Under the FDCA, a "new drug" is any drug "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective[4] for use under the conditions prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1). To introduce a "new drug" into interstate commerce, the FDA must approve a new drug application ("NDA") or an abbreviated new drug application ("ANDA"), or the new drug must be exempt from the approval process pursuant to an investigational new drug application ("IND"). *See* 21 U.S.C. §§ (a), (b), (j), and (i). Otherwise, a person who introduces or delivers for introduction into interstate commerce an unapproved new drug violates 21 U.S.C. § 331(d). The FDCA defines "interstate commerce" as commerce between any state and any place outside of it. 21 U.S.C. § 321(b)(1).

---

[4] For a drug to be "generally recognized as safe and effective" ("GRAS/E"), it must (1) have substantial evidence of safety and effectiveness as demonstrated through adequate and well-controlled clinical studies; (2) the studies on which a claim of GRAS/E is based must be published in the scientific literature so that they are made generally available to the community of qualified experts; and (3) there must be a consensus of opinion among qualified experts, which is based on the published studies, that the drug is safe and effective for its labeled indications. *See United States v. S Hackett Mktg. LLC*, 2018 WL 4146606, at *3 n.4 (D.N.J. Aug. 30, 2018) (citing 21 U.S.C. § 355(d)).

Here, upon a review of the Complaint, the Court finds that the Government has sufficiently pled that Defendants violated 21 U.S.C. § 331(d) by introducing an unapproved new drug into interstate commerce.

### a. **MMS is a "Drug" under the FDCA**

Plaintiff alleges, with specific examples, that Defendants' "labeling" demonstrates that MMS is intended to cure, mitigate, treat, or prevent COVID-19 and other diseases. (Complaint at ¶ 13.) For instance, the Government claims that on March 3, 2020, Defendants posted instructions for using MMS as a treatment for COVID-19 on the News Website. (*Id.* at ¶ 14.) The post claimed that "[t]he Coronavirus is curable!" and that following the instructions would "wipe out this flu-like virus . . . ." (*Id.*) Moreover, in a video posted on the Radio Website, Mark Grenon and Joseph Grenon made the following statements regarding MMS' potential to treat COVID-19:

> The Coronavirus is curable, do you believe it? You better.
>
> Every week I am putting in the G2Sacramental dosing for Coronavirus, why . . . we have a family on it, we have a couple of other people . . . 6 drops MMS activated 4oz of water every two hours four or five times the first day, it should, it might even kick it out the first day, it should, it might even kick it out the first day, but depends on how long you've had it, if it's in your lungs, do it the second day again, then I'd go to three drops eight hours a day for three or four days, then just to keep going, kick it out of you. Small children, we can cut everything in half, three drops every two hours versus a couple days, three hours then a drop really, not three.
>
> The Coronavirus is curable, you believe that? You better . . . it's wicked good stuff Joe.
>
> MMS will kill it.

(*Id.* at ¶ 15.) In light of these particularized allegations, the Court finds that the Government has alleged that MMS is a "drug" within the meaning of the FDCA. *See S*

8

*Hackett Marketing*, 2018 WL 4146606, at *3 (finding that plaintiff sufficiently alleged that products were "drugs," based on allegations that the labeling made "at least thirty-two structure and function claims."); *United States v. BioAnue Labs., Inc.*, 2014 WL 3696662, at *6 (M.D. Ga. July 23, 2014) (finding products to be "drugs" at the summary judgment stage because the defendant's websites were "replete with claims that [ ] products are intended to cure, mitigate, treat, or prevent disease in man."); *United States v. Berst*, No. 6:11-CV-6370-TC, 2012 WL 4361408, at *4 (D. Or. Aug. 2, 2012), *report and recommendation adopted*, 2012 WL 4361559 (D. Or. Sept. 20, 2012) (same).

### b. **MMS is an Unapproved "New Drug" under the FDCA**

The Complaint alleges that MMS is a "new drug," because it is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for treating COVID-19 and other illnesses. (*Id.* at ¶ 24.) Specifically, Plaintiff claims that:

> [The] FDA conducted comprehensive searches of the publicly-available medical and scientific literature for MMS . . . and determined that there are no published, adequate and well-controlled studies demonstrating that Defendants' MMS is safe and effective for use under the conditions prescribed, recommended, or suggested in its labeling. Because there are no published adequate and well-controlled studies for the intended uses of MMS to cure, mitigate, treat, or prevent coronavirus, or any other disease, qualified experts cannot have come to a consensus of opinion concerning its effectiveness for such uses.

(*Id.* at ¶ 25.) The Government also explains that "[a]fter searching its records for NDA, ANDA, and IND submissions by Defendants, FDA determined that there are no approved NDAs or ANDAs and no INDs in effect for MMS." (*Id.* at ¶ 26.) With these allegations, the Government has sufficiently pled that MMS is an unapproved "new drug" within the

9

meaning of the FDCA. *See S Hackett Marketing*, 2018 WL 4146606 at *3 (finding that plaintiff sufficiently alleged that products were unapproved "new drugs," based on allegations that the FDA found "no adequate and well-controlled studies" demonstrating the effectiveness of the products for their intended use, and that the defendants lacked an approved "NDA or ANDA, or effective IND for any of their drugs."); *BioAnue Labs.*, *Inc.*, 2014 WL 3696662 at *7 (finding that products were unapproved new drugs at the summary judgment stage, based on evidence that the Government's search "found no published studies of any kind on the Defendants' products" and "no approved new drug applications for any of the Defendants' products."); *United States v. Hakim*, 2020 WL 2751020, at *8 (S.D.N.Y. May 26, 2020) (same).

### c. **Defendants Distributed MMS into Interstate Commerce**

Finally, Plaintiff has plausibly alleged that Defendants distributed MMS into interstate commerce by pleading that "[o]n or about March 27, 2020, Defendants shipped MMS from Florida to Virginia," which constitutes distribution in "interstate commerce" within the meaning of 21 U.S.C. § 321(b)(1).  (*Id.* at ¶ 28.)  *See S Hackett Marketing*, 2018 WL 4146606 at *4 (finding that plaintiff sufficiently pled interstate commerce by alleging, *inter alia*, that the defendants had shipped "various Illicit Drugs from New Jersey to Maryland."); *Hakim*, 2020 WL 2751020 at *8 (finding that plaintiffs established this element at the summary judgment stage, based on evidence that the defendants had shipped products from New York to North Carolina).

Because Plaintiff has sufficiently alleged that Defendants distributed MMS, an unapproved "new drug," into interstate commerce, the Complaint states a cause of action

under 21 U.S.C. § 331(d). Accordingly, the Government is entitled to final default judgment against the Defendants as to this claim.

### 2. 21 U.S.C. § 331(a)

The FDCA prohibits "[t]he introduction or delivery for introduction into interstate commerce" a drug that is "misbranded." 21 U.S.C. § 331(a). A drug is "misbranded" under 21 U.S.C. § 352(a) if "its labeling is false or misleading in any particular." Misbranding under this provision requires the Government to establish two elements: "(1) a representation in the labeling of the device; and (2) the false or misleading nature of that representation." *United States v. Torigian Labs., Inc.*, 577 F. sSupp. 1514, 1525 (E.D.N.Y.), *aff'd sub nom. United States v. Torigian Labs.*, 751 F.2d 373 (2d Cir. 1984). A drug is "misbranded" under 21 U.S.C. § 352(f)(1) if its labeling fails to bear "adequate directions for use" and is not exempt from this requirement. "[A]dequate directions for use" are those "under which the layman can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5. Prescription drugs, by their definition, cannot have adequate directions for layperson use. *See* 21 U.S.C. § 353 (b)(1)(A). The FDCA defines a "prescription drug" as a product that "because of its toxicity or other potentiality for harmful effects . . . is not safe for use except under the supervision of a practitioner licensed by law to administer such a drug." *Id.*

Plaintiff has adequately pled that MMS is "misbranded" within the meaning of 21 U.S.C. § 352(a). As previously discussed, the Government alleges that Defendants' "labeling" claims that MMS can effectively treat COVID-19 and "a litany of other serious diseases." (Complaint at ¶ 31; *supra* at SectionIII.A1a.) Plaintiff contends that these claims are false and misleading because "[t]he curative claims in Defendants' labeling

lack expert scientific support; there are no published, adequate, and well-controlled studies that demonstrate that MMS is safe and effective at treating coronavirus or *any* disease, including the litany of disease identified in the labeling." (Complaint at ¶ 32.) These pleadings sufficiently state the elements of "misbranding" under 21 U.S.C. § 352(a). *See United States v. Undetermined Quantities of Articles of Drug*, 145 F. Supp. 2d 692, 702 (D. Md. 2001) ("in the absence of clinical proof, in the form of adequately controlled clinical studies, which establishes that the product is effective for any indicated use, any representation as to its proven efficacy is false and misleading, and therefore, the product is misbranded.") (quoting *United States v. Sene X Eleemosynary Corp., Inc.*, 479 F. Supp. 970, 980 (S.D. Fla. 1979)) (internal brackets and ellipses omitted).

The Complaint also contains well-pled allegations demonstrating that MMS is *per se* "misbranded" under 21 U.S.C. § 352(f)(1) for lacking "adequate directions for use," because it is a "prescription drug." Plaintiff alleges that "Defendants' MMS is a prescription drug because it is intended for curing, mitigating, treating, or preventing coronavirus, which includes COVID-19, a disease that requires diagnosis and management by a physician." (Complaint at ¶ 36.) It contends that "there are no adequate directions under which a layman can safely use this drug, because it is not safe for use except under the supervision of a physician." (*Id.*) The Government further explains that the exemptions from the adequate directions for use requirement in § 352(f)(1) do not apply to MMS because "each exemption requires the drug to bear the labeling approved by FDA in an NDA." (*Id.*) It claims that "[b]ecause MMS is not the subject of an approved NDA or ANDA, Defendants' MMS does not qualify" for an exemption. (*Id.*) These allegations sufficiently plead "misbranding" under 21 U.S.C. §

352(f)(1). *See United States v. Hakim*, 2020 WL 2751020 at *8 ("the record shows that many of Defendants' drugs are intended for treating serious diseases or conditions such as HIV, cancer, and Ebola, all of which require diagnosis and management by a physician. As such, they are *only* safe for use under the supervision of a physician, which brings them within the definition of prescription drugs. . . they are presumptively misbranded unless they qualify for [an exemption], none of which apply here."); *See S Hackett Marketing*, 2018 WL 4146606 at *3 (finding plaintiff sufficiently alleged misbranding under 21 U.S.C. § 352(f)(1) based on pleadings that "medical expertise and special clinical assessments are needed to diagnose and determine the appropriate therapeutic interventions for many of [the products'] intended uses, including erectile dysfunction, impotence, and prostatitis. . . .").

Because the Complaint contains well-pled allegations showing that MMS is a "misbranded" drug within the meaning of 21 U.S.C. §§ 352(a) and (f)(1), and that Defendants distributed MMS into interstate commerce, *see supra* at SectionIII.A1c, the Complaint states a cause of action under 21 U.S.C. § 331(a). Accordingly, the Government is also entitled to final default judgment against Defendants as to this claim.

### 3. **21 U.S.C. § 331(k)**

The FDCA prohibits causing a drug to become misbranded while it is "held for sale (whether or not the first sale) after shipment in interstate commerce. . . ." 21 U.S.C. § 331(k). To establish a violation of § 331(k), the Government must prove that (1) the relevant product is a drug, (2) defendants received the drug or its components after shipment into interstate commerce, (3) the product is being "held for sale," and (4) defendants have misbranded, or caused the misbranding of, the drug. The second

element, "interstate commerce," is met even if a single ingredient or component is shipped interstate. *See United States v. Regenerative Scis., LLC*, 878 F. Supp. 2d 248, 259 (D.D.C. 2012), *aff'd*, 741 F.3d 1314 (D.C. Cir. 2014). The third element, "held for sale," is satisfied when the product is used for purposes other than personal consumption. *See United States v. US Stem Cell Clinic, LLC*, 403 F. Supp. 3d 1279, 1298 n.11 (S.D. Fla. 2019) ("Courts have interpreted 'held for sale' as meaning any use beyond personal consumption.").

Here, the Government has plausibly alleged a 21 U.S.C. § 331(k) violation. As previously explained, the Complaint provides well-pled allegations showing that MMS is a "drug" and that it is "misbranded" within the meaning of the FDCA. *See supra* at Section III.A.1.a and Section III.B. Plaintiff has pled the "interstate commerce" element by alleging that Defendants received one or more MMS ingredients or components from outside of Florida. (*Id.* at ¶ 41.) *See United States v. Dianovin Pharm., Inc.*, 475 F.2d 100, 103 (1st Cir. 1973) ("The appellants' use of components shipped in interstate commerce to make [the subject product] brought their activities within § 331(k)."); *Baker v. United States*, 932 F.2d 813, 815 (9th Cir. 1991). Because Plaintiff alleges that Defendants "sell and distribute" MMS to consumers, the Complaint also states that MMS is "held for sale." (Complaint at ¶ 4.) Accordingly, the Court finds that the Complaint also states a claim under 21 U.S.C. § 331(k).

### B. <u>Entitlement to a Permanent Injunction</u>

Having determined that the Government is entitled to final default judgment against Defendants as to its claims under 21 U.S.C. §§ 331(d), (a), and (k), the Court turns to its

requested relief for a permanent injunction under 21 U.S.C. § 332(a), which authorizes the Court to restrain violations of Section 331 of the FDCA.

To obtain a permanent injunction under the FDCA, the Government "need not show that it would suffer irreparable harm if the injunction were not granted." *United States v. US Stem Cell Clinic, LLC*, 403 F. Supp. 3d 1279, 1300 (S.D. Fla. 2019) (citing *Gresham v. Windrush Partners, Ltd.,* 730 F. 2d 1417, 1423 (11th Cir. 1984)). Instead, a permanent injunction is appropriate when the Government has demonstrated that Defendants have violated the applicable statute and that there is some reasonable likelihood that violations may reoccur. *Id.*; *United States v. Hakim*, 2020 WL 2751020, at *9 (S.D.N.Y. May 26, 2020). In making this determination, courts review: (1) "whether a defendant's violation was isolated or part of a pattern, (2) whether the violation was flagrant and deliberate or merely technical in nature, and (3) whether the defendant's business will present opportunities to violate the law in the future." *US Stem Cell Clinic*, 403 F. Supp. 3d at 1300 (alterations made).

Here, because the Government is entitled to final default judgment, its well-pled allegations regarding Defendants' violations of 21 U.S.C. §§ 331(d), (a), and (k) are deemed admitted. *See Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1339 (11th Cir. 2014). Accordingly, Plaintiff has established that Defendants violated various provisions of Section 331 of the FDCA. *See S Hackett Marketing*, 2018 WL 4146606 at *4. Moreover, the Government has also demonstrated that unless enjoined, there is a reasonable likelihood that Defendants will continue to violate the FDCA.

First, Defendants' distribution and misbranding of MMS are not isolated incidents. After the Court entered its temporary restraining order and preliminary injunction order—

both containing provisions that prohibited Defendants from distributing and misbranding MMS[5]—Defendants continued to distribute MMS by directing customers to alternate sources, and misbrand MMS by refusing to remove claims regarding its curative potential on the websites. (DE 39-1; DE 23-1.) Second, Defendants' violations are not merely technical, but deliberate. When confronted with the warning letter, Defendants did not take measures to comply. Instead, they declared that the FDA did not have jurisdiction over their activities and that they would not be taking any corrective measures, stating in their written response, "[t]here will be NO corrective action on our part. . . You have no authority over us!" and "We don't have to cease anything in regard to our Church Sacraments [MMS]! You cease and desist and harassing us!" (DE 3-2 at exs. 9, 10.)

The week after the Court entered its temporary restraining order, Defendants posted a video on the Radio Website that explained, "[j]ust because the FDA submits a TRO and the DOJ . . . signs the order, it doesn't mean it has to be obeyed or even given attention," and "[w]ell, we're not going to be under compliance to them because they're not over us." (DE 23-4; DE 33-1.) The week following the Court's entry of the preliminary injunction order, Defendants posted another video on the Radio Website, in which the following statements were made:

> We're going to obey God rather than men. Well, what about
> if you go to jail? Ha ha ha ha . . . You think we're afraid of

---

[5] Both orders state "Defendants and each and all of their directors, officers, agents, representatives, employees, successors, assigns, attorneys and any and all persons in active concert or participation with any of them (hereinafter, "Associated Persons") who receive actual notice of this Order, shall not, during the pendency of this action, directly or indirectly, label, hold, and/or distribute any drug, including but not limited to MMS. . . ." and "Defendants and Associated Persons, shall not, directly or indirectly, violate 21 U.S.C. § 331(k) by causing any drug, including but not limited to MMS, to become misbranded within the meaning of 21 U.S.C. § 352(a) and/or (f)(1) after shipment of one or more of its components in interstate commerce." (DE 4; DE 26) (emphasis added.)

16

> some Obama-appointed judge that broke their oath? You're no judge.
>
> We're not going to stop anything.
>
> We're not obeying it [the preliminary injunction order]. Don't care what you do . . . we're going to carry on anyways, so it's not going to stop us. But we're going to carry on directly, directly, whatever you say.

(DE 33-1.) In light of these remarks, it is also evident that Defendants' business will present opportunities to violate the FDCA in the future; Defendants have used their websites to market and sell MMS in violation of the FDCA and have openly declared their intent to persist in such violations, notwithstanding the Court's orders. (DE 3; DE 33.)

For these reasons, the Court finds that the entry of a permanent injunction against Defendants is appropriate. *See US Stem Cell Clinic*, 403 F. Supp. 3d at 1300 (finding entry of permanent injunction appropriate because, *inter alia*, the defendant did not comply with the FDCA after receiving a warning letter); *S Hackett Marketing*, 2018 WL 4146606 at *8 (same).

IV. **CONCLUSION**

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Plaintiff's motion for final default judgment against Mark Grenon and Joseph Grenon (DE 72) is **GRANTED**. Judgment is entered in favor of Plaintiff, the United States of America, and against Defendants Mark Grenon and Joseph Grenon. A permanent injunction order against Defendants will follow in a separate order.

**DONE AND ORDERED** in chambers in Miami, Florida, this 3rd day of August, 2020.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE